AO 91 (Rev. 11/11)  Criminal Complaint

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Texas

United States Courts
Southern District of Texas
FILED

*February 11, 2026*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| United States of America<br>v.<br>Nikolai Buzolin<br><br>_____<br>*Defendant(s)* | )<br>)<br>)  Case No. **4:26-mj-107**<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __February 11, 2026__ in the county of __Harris__ in the
__Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:

See the attached affidavit in support of criminal complaint.

☐ Continued on the attached sheet.

*Jeffrey Bawlson*
Complainant's signature

Jeffrey Bawlson, Special Agent, FBI
Printed name and title

Sworn to before me and signed in my presence.

Date: __February 11, 2026__

*Dena Palermo*
Judge's signature

City and state: __Houston, Texas__    Hon. Dena H. Palermo, U.S. Magistrate Judge
Printed name and title

4:26-mj-107

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jeffrey Bawlson, your affiant, being duly sworn, do depose and state as follows:

**I.     Identity and Experience of Affiant**

1.      I am a Special Agent with the Federal Bureau of Investigations (FBI) and have been since 2004. I have been assigned to investigate Health Care Fraud, 18 U.S.C. §§ 1347; Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349; Money Laundering, 18 U.S.C. § 1956; and Wire Fraud 18 U.S.C. § 1343 matters for approximately 8 years. Before being assigned to investigate healthcare fraud matters with the FBI, I was assigned to National Security matters where I was trained for and assigned to investigations related to Counterintelligence, Counter Espionage, and Counter Proliferation for 12 years. Throughout my years as an investigator, I have utilized investigative techniques which include several forms of electronic surveillance, physical surveillance, interviewing witnesses, execution of search warrants, and liaising with federal, foreign, and local authorities.

**II.    Purpose of the Affidavit**

2.      This affidavit is made in support of a complaint and arrest warrant charging Nikolai Buzolin ("BUZOLIN") with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), from in and around July 2025, through in and around January 2026. BUZOLIN is the nominee owner of a Houston-based company called Verisola, Inc. ("Verisola") which purports to be a durable medical equipment ("DME") supplier. The investigation into BUZOLIN and Verisola has revealed that Verisola has targeted Medicare Part C with fictitious, false, and fraudulent claims for DME that was never provided, and for which Verisola was reimbursed by multiple Medicare Part C plans for that DME via check. The investigation has further revealed that BUZOLIN formed Verisola with the Texas Secretary of State, registered Verisola with the National Plan and

1

Provider Enumeration System ("NPPES"), established several bank accounts for Verisola, and then wired the proceeds from the reimbursement checks to bank accounts overseas.

3. This case is being investigated by the FBI; the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"); and the Texas Department of Insurance.

4. The facts set forth in this affidavit were gathered in the course of an investigation conducted by me and other federal agents. The information set forth herein is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit. Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only. All figures, times, and calculations set forth herein are approximate.

### III.   The Alleged Offenses

5. Federal law makes it a crime for two or more persons to conspire to commit the offense of money laundering, that is to knowingly conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and to

knowingly engage or attempt to engage in a monetary transaction, of a value greater than $10,000, knowing that the transaction involved criminally derived property, and which in fact was derived from a specified unlawful activity, in violation of 18 U.S.C. § 1957(a).

### IV.     **The Medicare Program**

6.      Medicare is a federally funded health insurance program that provides health care benefits to individuals who are 65 years of age or older or disabled.  It is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).  Medicare is administered by the Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services ("CMS").  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

7.      As relevant here, Medicare Part C authorizes CMS to contract with public or private organizations, including private health insurance companies, to offer a variety of health plan options for beneficiaries.  These Medicare Part C insurers are also known as Medicare Advantage Organizations ("MAOs").  MAOs cover most of the same services covered under Medicare Parts A and B (i.e, traditional Medicare), including DME, and provide additional mandatory benefits and optional supplemental benefits.

8.      To obtain payment for services or treatment provided to a beneficiary enrolled in an MAO, providers submit claims to the MAO, often through electronic claims clearinghouses.  In submitting claims to the MAO, the providers certify, either explicitly or by incorporation of applicable rules, that the contents of the form are true, correct, and complete, and that the form was prepared in compliance with applicable Medicare laws and regulations. Providers also certify that the services were medically necessary and were, in fact provided, as billed.

3

9.  A provider need not enroll with Medicare to submit claims to MAOs. Moreover, providers need not contract with MAOs as in-network providers to submit and receive reimbursement for claims. MAOs considers such out-of-network providers as "non-participating providers." Non-participating providers do not have to disclose corporate information such as ownership or banking information, although non-participating providers are required to obtain a National Provider Identifier ("NPI") number, which a provider obtains by registering with the NPPES.

### V. Probable Cause to Believe that the Crime of Conspiracy to Commit Money Laundering has been Committed

#### A. Relevant Entities and Individuals

10.  Verisola, Inc., is a company located at 2500 Wilcrest Drive, Suite 300, Office 35, Houston, Texas 77042. According to the NPPES, Verisola is classified as a DME supplier.

11.  BUZOLIN was a resident of Harris County, Texas, and the nominee owner of Verisola.

12.  Individual 1 is a resident of Harris County, Texas, and is an employee or contractor for Verisola.

#### B. Formation of Verisola and Registration with the NPPES

13.  BUZOLIN formed Verisola as a for-profit corporation with the Texas Secretary of State on July 14, 2025. The certificate of formation lists BUZOLIN as the sole director and organizer.

14.  BUZOLIN registered Verisola for an NPI number on July 25, 2025.

15.  In June and July 2025, BUZOLIN toured office space for Verisola and signed an agreement to rent Verisola's office space at its current location with Regus, a property management

company. In July 2025, Regus sent BUZOLIN a photograph of Verisola's office space, shown below, at BUZOLIN's request:



### C. BUZOLIN's Creation of Bank Accounts for Verisola

16. BUZOLIN opened six different bank accounts for Verisola from July 30, 2025, to August 7, 2025. These include the following accounts (BUZOLIN was the sole signer on all accounts):

| Bank | Last Four Digits of Account | Date of Opening | Shorthand |
|---|---|---|---|
| JPMC | 8789 | July 30, 2025 | "Verisola JPMC" |
| Comerica | 4897 | July 31, 2025 | "Verisola Comerica" |
| Wells Fargo | 4032 | July 31, 2025 | "Verisola Wells Fargo" |
| Truist | 9388 | August 4, 2025 | "Verisola Truist" |
| Cadence | 2993 | August 6, 2025 | "Verisola Cadence" |
| Bank of Texas | 0164 | August 7, 2025 | "Verisola Bank of Texas" |

5

### D. Verisola's Billings to MAOs and Associated Claims Data

17. In and around July 2025, BUZOLIN entered into an agreement with Availity, an electronic claims clearinghouse that providers can use to submit claims to MAOs, on behalf of Verisola. According to Availity records, Verisola submitted approximately 212,000 claims to MAOs from August 2025 through January 2026. According to these records, BUZOLIN was associated with only three of these claims. The vast majority of the remaining claims were associated with IP addresses that, according to a search of open-source database WhoIs, were associated with locations in the Philippines or with virtual private networks ("VPNs"). For example, approximately 11,700 claims were registered to an IP address in the Philippines, while 6,500 claims were submitted from an IP address in Dallas, Texas associated with VPN company Vultr. Records from Vultr reflect that the VPN customer for this Dallas-based IP address is based in Russia. In my training and experience, individuals involved in healthcare fraud schemes may attempt to evade detection and prosecution by using technology, like VPNs, to obscure their association with the scheme.

18. Thus, the Availity records and the MAO claims data reflect that Verisola has been targeting MAOs with high volumes of claims for DME. For example, for Blue Cross Blue Shield alone, Verisola submitted over $384 million in claims from July 2025 through November 2025, although Blue Cross Blue Shield reimbursed only $345,275. As discussed in more detail below, Verisola has deposited approximately $1.7 million in reimbursement checks from MAOs into Verisola's various bank accounts.

### E. Beneficiary Interviews and Provider Interviews Reflect that Verisola's Claims were Fraudulent

19. Investigators employed by MAOs have determined that Verisola's claims were fraudulent based on statements from MAO beneficiaries who reported seeing Verisola claims on

6

their explanation of benefits but never receiving any DME. In addition to beneficiary statements to MAO representatives, law enforcement has also interviewed eight beneficiaries (or their family members) for whom Verisola billed to the MAOs. All stated that the beneficiary never received DME billed by Verisola. Several of the beneficiaries also stated that they did not recognize the provider who purportedly referred the DME orders to Verisola and that the beneficiary did not need the DME billed by Verisola.

### F. BUZOLIN's Role in Laundering Fraud Proceeds

20. An analysis of bank records for Verisola's various accounts revealed that from August 2025 through November 2025, approximately $1.7 million in MAO reimbursements were deposited into Verisola bank accounts. This $1.7 million in MAO reimbursements appears to have been the sole source of funds in the Verisola bank accounts, other than de minimis cash deposits. Because the investigation has not revealed that Verisola billed any legitimate claims, the entirety of the $1.7 million deposited into Verisola's bank accounts are considered proceeds of healthcare fraud and wire fraud, which are specified unlawful activities.

21. The investigation revealed that BUZOLIN almost never deposited the MAO reimbursement checks sent to Verisola. Instead, law enforcement surveillance and bank surveillance records revealed that Individual 1 would travel to Verisola's office, exit with a bag, and then travel to various banks to deposit the MAO reimbursement checks. Although BUZOLIN emailed Regus in and around August 2025 to request that Individual 1 be given access to Verisola's office, the investigation reflects that BUZOLIN otherwise had minimal to no contact with Individual 1. Based on my knowledge of other related investigations, I believe that Individual 1 was hired by associates of BUZOLIN to staff Verisola's office and pick up mail (including reimbursement checks).

7

22.  At times, the MAOs would direct a bank to return or stop payment on a deposited check to a Verisola account. For example, on August 26, 2025, Individual 1 deposited approximately $32,639.40 in reimbursement checks from Blue Cross Blue Shield (acting as an MAO) into Verisola Truist, and on August 29, 2025, Truist reversed $31,602.30 of these checks, which left the Verisola Truist account balance negative. On September 4, 2025, Truist mailed Verisola at its office address to inform Verisola that Truist was closing Verisola's account.

23.  After Individual 1 deposited reimbursement checks at the bank (and at times after MAOs issued stop payments or banks closed Verisola accounts), BUZOLIN would either withdraw funds from the banks as cashiers' checks or wire funds to bank accounts overseas. An example of these transactions in table format is listed below:

| Date of Transaction | Relevant Account(s) | Description of Transaction |
|---|---|---|
| August 18, 2025 | Verisola JPMC | Individual 1 deposited $203,682.96 in MAO reimbursement checks |
| August 20, 2025 | Verisola Wells Fargo | Individual 1 deposited $44,479.43 in MAO reimbursement checks |
| August 25, 2025 | Verisola Wells Fargo | Wells Fargo implemented stop payment orders on $26,444.74 in deposited reimbursement checks |
| August 26, 2025 | Verisola Truist | Individual 1 deposited $32,439.40 in MAO reimbursement checks |
| August 26, 2025 | Verisola JPMC and Verisola Wells Fargo | BUZOLIN withdrew a $48,950.00 cashier's check from Verisola JPMC and deposited it into Verisola Wells Fargo the same day |
| August 28, 2025 | Verisola JPMC | Individual 1 deposited $183,97.86 in MAO reimbursement checks |
| August 28, 2025 | Verisola JPMC | BUZOLIN withdrew a $83,900.00 cashier's check from Verisola JPMC and deposited it into Verisola Wells Fargo the same day |
| August 29, 2025 | Verisola Truist | Truist implemented stop payment orders on $32,392.23 in deposited reimbursement checks |
| August 29, 2025 | Verisola Wells Fargo | Verisola Wells Fargo wired $55,800.00 to a Hong Kong overseas company[1] |

---

[1] Although the bank records do not identify who sent this wire transfer (nor is there corresponding surveillance), surveillance from Bank of Texas shows that BUZOLIN went to the bank in-person to send overseas wires.

| August 29, 2025 | Verisola JPMC and Verisola Wells Fargo | BUZOLIN withdrew a $98,550.00 cashier's check from Verisola JPMC and deposited it into Verisola Wells Fargo the same day |
| September 2, 2025 | Verisola Wells Fargo | Verisola Wells Fargo wired $81,150.00 to a Hong Kong overseas company |

24. The bank records do not reveal any legitimate business purposes for either (a) the opening of six different bank accounts in Verisola's name within the span of a week, or (b) the same day withdrawal and deposit of cashier's checks from one bank to another. Nor do the bank records reflect that Verisola had any business expenses, like purchasing DME or shipping services associated with mailing DME to beneficiaries, that support the submission of its claims to MAOs.[2]

25. As discussed above, the beneficiary interviews by law enforcement and beneficiary statements to MAOs regarding Verisola's DME claims establish that Verisola's DME claims were fictitious and the reimbursement checks deposited on those claims were fraud proceeds. Moreover, based on bank statements, BUZOLIN was aware that stop payments were being issued, that bank accounts were being closed, and that there was no legitimate business reason for the opening of accounts and the transfer of funds between accounts; and BUZOLIN was involved in wiring these funds overseas. Given the fraudulent nature of the proceeds BUZOLIN transferred, and BUZOLIN's knowledge of Verisola's operation from the bank records, I have probable cause to believe that (a) BUZOLIN was acting as a nominee owner for Verisola and knew that he was not the true owner, notwithstanding his representations to the Texas Secretary of State, the NPPES, or the banks where he opened Verisola accounts; (b) that BUZOLIN knew the funds he transferred were the result of fraudulent activity, specifically, the submission of false claims to MAOs; and (c) that BUZOLIN was acting to conceal the intended beneficiary of the funds by engaging in

---

[2] Although bank records show that Verisola paid Individual 1 and credit card records show that BUZOLIN paid Regus rent for office space, these expenses also do not support that Verisola was a provider that purchased and/or mailed DME as reflected in its claims submissions to MAOs.

9

transactions that resulted in the movement of fraud proceeds between Verisola bank accounts before moving fraud proceeds to overseas companies. In total, BUZOLIN transferred approximately $1.2 million in fraud proceeds from Verisola's bank accounts to banks overseas.

## VI. Conclusion

26. Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around August 2025, and continuing through January 2026, in the Southern District of Texas, and elsewhere, BUZOLIN committed violations of 18 U.S.C. § 1956(h).

27. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Jeffrey Bawlson*

Jeffrey Bawlson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone, and I find probable cause this 11th day of February 2026.



*Dena Palermo*

Hon. Dena H. Palermo
United States Magistrate Judge

11